**STATE v. COLEMAN.**

No. 43723.

Supreme Court of Missouri.

Division No. 2.

April 12, 1954.

Lewis F. Randolph, Waldo P. Goff, St. Joseph, for appellant.

John M. Dalton, Atty. Gen., Paul McGhee, Asst. Atty. Gen., for respondent.

LEEDY, Jr., Judge.

Appellant, Ira Coleman (hereinafter referred to as defendant), was convicted in the Circuit Court of Buchanan County of selling intoxicating liquor without first having procured a license from the supervisor of liquor control. Under Section 311.550(7) RSMo 1949, V.A.M.S., the offense is a felony; hence, appellate jurisdiction is in this court.

Defendant's first point is a challenge of the sufficiency of the evidence to make a submissible case against him. It may be said at the outset that there was so much confusion and uncertainty in the evidence with respect to the identification of two of the principals (Ira and his identical twin brother, Ora) as to perhaps warrant reference to this prosecution as that of the baffling case of the identical twins. But the case does not turn as much upon the question of defendant's identity as upon the legal relationship, if any, which existed between him and the person who actually sold the liquor in question, and for this reason details of the facts and incidents (some approaching comic opera design) which created or contributed to cause the confusion just mentioned need not be stated in full. Enough to highlight the situation will be sufficient.

Defendant is a colored man. His identical twin, Ora, is the owner and operator of the Charleston Hotel in St. Joseph, where the offense is alleged to have occurred. Shortly after midnight, December 2, 1950, and while on duty, two deputy sheriffs, Norman Clark and Charles Mehelic, went to the Charleston Hotel, purchased whiskey, and made an arrest. Their accounts of the surrounding facts were exceedingly sketchy. To quote Clark, they "walked into the dining room and ordered two drinks of whiskey. A lady waitress there poured us a couple of drinks of whiskey,

and in the meantime there was a colored boy down here from South St. Joe walked up, and we also bought a drink for him." Witness consumed his drink (which he identified as whiskey), and Mehelic poured his into a little bottle and preserved it as evidence. To the leading question, "Did you pay for the liquor you and Mehelic drank, or was it given to you?" the witness answered, "I paid for it." Clark further testified that they arrested *Ora* Coleman, who was then on the "tavern side" of the hotel, and took him to the county jail, after first permitting him to go into a room where his twin brother was for the purpose of changing clothes and turning over his keys and money to the brother.

Asked how he knew the man he picked up was *Ora* Coleman, Clark replied, "He just gave his name as Ora Coleman."

"Q. The Coleman twin you picked up told you he was Ora Coleman? A. Right.

"Q. Where did you take him? A. As he left, he left his money with his brother, and * * * put on his topcoat and hat, and we brought him on to the county jail.

"Q. Did you bring up both of the Coleman boys? A. No, I didn't.

"Q. You brought up one Coleman who told you his name was Ora? A. Right.

"Q. Can you tell those two Colemans apart when you see them not together? A. I cannot."

Mehelic's testimony was likewise meager as to the facts surrounding the sale, his testimony in that regard being merely that he and Clark "sat down at a table and ordered a drink;" that the drink he got was whiskey; and he thus identified a bottle containing whiskey (Exhibit A), "It's the whiskey we got from the Charleston Hotel the night we arrested Ora Coleman." At this point in his testimony, and without having previously so testified, the witness was asked by the prosecutor, "How do you know it was *Ora* Coleman who sold you that whiskey?" to which witness replied, "When we brought him to the jail from down there he gave his name as Ora Coleman." One of the three questions put to this witness on cross-examination was: "Q. Can you tell Ora Coleman from Ira Coleman?" Witness answered, "No, I can't tell them." And on further cross-examination, in rebuttal: "Q. As I understand it, so far as you are concerned, you don't know whether the man that came out of that room and that you took up to jail is the same man that you took out of that room, because you can't identify them? A. No, I can't identify them." It was further shown that after the arrested twin entered the room, the door was closed and remained closed, and the twin was out of the officers' sight for a couple of minutes or more.

The state next called Ora's wife, Martha Coleman (the one witness who had no difficulty in telling the twins apart), and she testified that Ora got home about 2 o'clock on the night in question, and went to bed and stayed there until morning.

Ira, the defendant, testified that he worked for his brother at the Charleston, and had not yet gone on duty, but was resting in the room described by the deputy sheriff when Ora came in and said, "Get up and come on, they just arrested me." Ora then gave him the keys and about $250 in money and said he was going to jail— "Here are the keys, you go on out there." The *witness* then went to the door and the deputy said, "Come this way," to which witness replied, "All right." He went with the deputies and was taken to the jail by Norman Clark. At the jail defendant was greeted by a deputy sheriff, who said, "Hello, Ora," to which defendant said he replied, "This is Ira." He denied he told the deputies that he was Ora, declaring that he told them he was Ira. It was later stipulated that the twin actually taken to the jail was, in fact, Ira. Nor is there any question that he spent the remainder of the night (and until Monday morning, when released on bond) in jail. There was fur-

616

ther testimony touching identification by other witnesses, including one of Ira's attorneys, but as that issue is not the controlling one, no purpose would be served by reproducing that testimony.

It was shown that Ora was separately charged with the identical offense here involved, and placed on trial; that Norman Clark testified in that trial, and identified the man he arrested as Ora. But when Martha, Ora's wife, testified at that former trial (as she did in the case at bar) that Ora was home in bed, the prosecutor dismissed the case, and thereafter tried Ira in the present case as the culprit.

■■■ The state seeks to sustain the conviction on the theory "that appellant was, at the time of the sale, and arrest, actively managing the 'tavern side' of the hotel, and that the 'lady waitress' was acting in his behalf." On facts thus assumed, the state invokes the rule that proof of a sale by a clerk makes a prima facie case against the principal, and if he wishes to escape, he must rebut it by proof showing that the sale was without his knowledge or authority. State v. Durkem, 23 Mo.App. 387, 389; State v. Reiley, 75 Mo. 521, and cases therein cited. The position is untenable. The state's own proof affirmatively showed that Ira had no financial interest in the Charleston operation. The record is devoid of any proof that his employment was managerial or supervisory in character (even if such would make applicable the rule contended for), or that the waitress who actually made the sale was *defendant's* clerk or agent. For aught that appears, Ira's relationship to the common master, Ora, was precisely the same as that of the waitress, and they were therefore fellow employes, and, of course, the state does not contend that mere presence of fellow employes at the scene of an offense renders each answerable for the criminal acts of the other.

■■ Irrespective of whether granting permission to the twin under arrest to absent himself from the presence of the of-

ficers by going into a closed room to change clothes, etc., was a booby trap into which the officers stumbled, the evidence we have narrated conclusively demonstrates that the state thereby became disabled to discharge its burden of so identifying the particular defendant on trial as to prove his guilt beyond a reasonable doubt. For this reason it would be futile to remand the case for another trial. The judgment of conviction is reversed, and for the reason just stated, the defendant is ordered discharged.

All concur.